UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TORRANCE GRAHAM,

                 Plaintiff,                Civil Action No. 16-12258
                                          Honorable Linda V. Parker
v.                                        Magistrate Judge David R. Grand

HEATHER CHICOWSKI, WILLER,[1]
BOWERMAN, and MICHAEL TROUTEN,

                 Defendants.
_____/

## REPORT AND RECOMMENDATION TO DENY WITHOUT PREJUDICE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [10] AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [18]

Before the Court is a Motion for Summary Judgment filed on September 9, 2016, by Defendants Heather Chicowski, Tyler Willer, Paul Bowerman, and Michael Trouten (collectively "Defendants"), who are all Michigan Department of Corrections ("MDOC") employees. (Doc. #10). *Pro se* Plaintiff Torrance Graham ("Graham"), an incarcerated person, filed a response to this motion on October 11, 2016. (Doc. #15). No reply was filed. Also before the Court is Graham's December 29, 2016 Motion for Partial Summary Judgment (Doc. #18), which has been fully briefed. (Docs. #21, #22). An Order of Reference was entered on September 12, 2016, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b). (Doc. #11). Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody. *See* E.D. Mich. L.R. 7.1(f). Here, the Court finds that the facts and legal issues are adequately presented in the briefs, and it declines to order a hearing at this time.

---

[1] The docket incorrectly lists this Defendant as "Miller".

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment (**Doc. #10**) and Graham's Motion for Partial Summary Judgment (**Doc. #18**) be **DENIED WITHOUT PREJUDICE**.

## II.    REPORT

### A.    Background

#### i.    The Underlying Incidents

Graham is a State of Michigan prisoner who is currently confined at the Chippewa Correctional Facility in Kincheloe, Michigan.  He brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of his First and Fourteenth Amendment rights.  (Doc. #1).  At the time of the events at issue, Graham was housed at the Duane Waters Health Center ("DLW") in Jackson, Michigan, and the Saginaw Correctional Facility ("SRF") in Freeland, Michigan. (*Id.* at ¶ 3).  The MDOC's website explains that DLW is located on the premises of the Charles Egeler Reception and Guidance Center ("RGC").[2]  According to Graham, all of the named defendants were employed at DLW.  (*Id.* at ¶¶ 4-7).

Graham alleges that on September 7, 2014, he was transferred from a hospital in Lansing, Michigan, to DLW for intravenous antibiotic treatment.  (*Id.* at ¶ 10).  He alleges that while receiving his treatment on September 23, 2014, he informed the nurse that his IV site was sore and appeared to have a skin burn.  (*Id.* at ¶ 11).  He also advised that the IV bag was different from the one he had been administered earlier that day.[3]  (*Id.* at ¶¶ 13, 15).  He recalls that they

---

[2] Michigan Department of Corrections Charles Egeler Reception & Guidance Center (RGC), http://www.michigan.gov/corrections/0,4551,7-119-68854_1381_1385-5338--,00.html.

[3] Graham alleges that the treatment was different in terms of the number of IV bags used and the "start date" and "stop date" on the bag.  (Doc. #1 at ¶¶ 13, 15).  He recalled that his previous

also discussed the IV extension.  (*Id.* at ¶¶ 18-19).  Graham recounts this being a pleasant exchange, yet he alleges that before the nurse left the room, Defendant Nurse Supervisor Chicowski "came into the room in an aggressive manner and accused [him] of being argumentative with nursing staff [about an IV extension]."  (*Id.* at ¶¶ 20, 25).  Graham alleges that Chicowski instructed the nurse to "put down he refused his meds" if he continued to ask questions.  (*Id.* at ¶¶ 21, 27, 29).  She allegedly also told the nurse not to put any more extensions on his IV if his questioning did not stop.  (*Id.* at ¶ 27).  Before Chicowski left the room, Graham told her that he would be filing a grievance against her as DLW's Prisoner/Patient Bill of Rights gives him the right to ask questions.  (*Id.* at ¶¶ 22, 28, 31 36).

Graham alleges that shortly thereafter, Defendant Correctional Officer Willer also accused him of being argumentative.  (*Id.* at ¶ 37).  Willer allegedly told him to be quiet and not ask questions because "prisoners don't have any rights," so "they are to do as they are told."  (*Id.* at ¶¶ 35, 37-38, 45).  Graham alleges that Willer then said he was going to put him on "red card status."  (*Id.* at ¶ 41).  Graham alleges that he asked to speak to a supervisor but that Willer refused this request.  (*Id.* at ¶¶ 42-47).

Graham alleges that an unknown officer woke him and his cellmate up the next morning at 2:30 a.m.  (*Id.* at ¶ 52).  The cellmate was moved to a different location (*id.* at ¶ 59), and the unknown officer informed Graham that Defendant Sergeant Bowerman had instructed him to place Graham on "red card/toplock status" "for telling Chicowski that he was writing a grievance and threatening behavior."  (*Id.* at ¶¶ 54-56).  Graham explains that toplock "is a sanction for a misconduct" but asserts that he never received a misconduct related to this incident.  (*Id.* at ¶¶

---

treatment had been administered via two bags, with a September 19, 2014 "start date" and a September 25, 2014 "stop date."  (*Id.*).  In contrast, his later treatment was contained in one bag that had a September 11, 2014 "start date" and a September 15, 2014 "stop date."  (*Id.* at ¶ 12).

60-62, 66, 72).  Nor did he receive a hearing before these sanctions were imposed.  (*Id.* at ¶ 124).  On September 26, 2014, Graham was transferred to SRF.  (*Id.* at ¶ 82).

### b.      Issues with Graham's Grievances

Principally at issue in the Defendants' summary judgment motion is whether Graham filed grievances against them related to the foregoing incidents at DLW, and if so, whether he properly exhausted them.  In his complaint, Graham alleges that on September 24, 2014, he filed grievances against Chicowski and Willer.  (*Id.* at ¶¶ 77, 79).  He also alleges that he filed a grievance against Bowerman on September 26, 2014.  (*Id.* at ¶ 80).  Graham alleges that he never received receipts for the grievances he filed against Chicowski and Willer, and that his grievance against Bowerman was returned to him "minus a grievance identifier number but with [Graham's] name written in black marker."[4]  (*Id.* at ¶¶ 78, 86, 90).

Having not received receipts for his grievances against Chicowski or Willer, Graham had his father, Cecil Graham, call Defendant Trouten, who was RGC's Grievance Coordinator, "to see if a response to [those] grievances [] had been sent to [Graham]."  (*Id.* at ¶ 87).  Trouten allegedly ignored that phone call as well as a letters Graham had written to Trouten on October 20 and November 6, 2014 inquiring about the matter and requesting Step II appeal forms.  (*Id.* at ¶¶ 89, 93).  Graham allegedly also sent letters to Inspector Shavers at RGC on November 17 and 25, 2014 to follow up on the grievances filed against Chicowski, Willer, and Bowerman, but he claims he received no response.  (*Id.* at ¶¶ 98-99, 103-04).  Graham alleges that in between sending these letters to Shavers, he asked SRF Grievance Coordinator Vittow for a Step II grievance form for these three grievances filed against DLW staff, but Vittow told him he had to

---

[4]  As discussed below, although Graham included his prisoner number, lock number, and signature on his grievance against Bowerman, he failed to include his own name on the top part of the grievance, and it was rejected for that reason.

contact RGC Grievance Coordinator Trouten for these forms.  (*Id.* at ¶¶ 100-01).

On October 23, 2014, Graham filed a grievance against Trouten (Grievance Identifier RGC/2014/10/1177/11Z) (the "Trouten Grievance"), challenging Trouten's handling of Graham's grievances against these other Defendants.  (*Id.* at ¶ 91).  Graham contends that on November 6, 2014, he received a response to the Trouten Grievance, but no Step II appeal form. (*Id.* at ¶ 92).  Graham contends that he then made multiple attempts to obtain a Step II appeal form for the Trouten Grievance.  (*Id.* at ¶¶ 95-104).  Graham contends that he finally received a Step II appeal form on December 3, 2014.  (*Id.* at ¶ 105).  He submitted this form (*id.* at ¶ 107), and his Step II appeal was denied on December 10, 2014, on the grounds that it was tardy.  (*Id.* at ¶¶ 112-13).  Graham completed the Step III appeal, which affirmed the Step II denial.  Graham then filed the instant lawsuit.  The Defendants now seek summary judgment, arguing that Graham failed to properly exhaust his claims against them.

**B.     Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of

the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

      C.      **Analysis**

            *1.     Defendants' Motion for Summary Judgment*

The Defendants argue that summary judgment is warranted because Graham failed to properly exhaust his administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  (Doc. #10 at 9-15).  Under the PLRA, a prisoner may not bring an action, "under [§ 1983] or any other Federal law," to challenge his conditions of confinement until all available administrative remedies have been exhausted.  42 U.S.C. §1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).  This "exhaustion" requirement serves two main purposes:  (1) it promotes efficiency by encouraging the resolution of claims at the agency level before litigation is commenced, and (2) it protects administrative authority by allowing the agency an opportunity to correct its own mistakes before being haled into federal court.  *See Woodford*, 548 U.S. at 89.  The Supreme Court has held that this "exhaustion requirement requires proper exhaustion."  *Id.* at 93.  Proper exhaustion requires "compliance with an agency's

deadlines and other critical procedural rules." *Id.* at 90. Failure to exhaust is an affirmative defense that must be raised by a defendant and on which the defendant bears the burden of proof. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Vandiver v. Corr. Med. Servs., Inc.*, 326 F. App'x 885, 888 (6th Cir. 2009).

In determining whether a plaintiff has properly exhausted his claim, the only relevant rules "are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 200. In Michigan's correctional facilities, prisoner grievances are governed by MDOC Policy Directive 03.02.130, entitled "Prisoner/Parolee Grievances" (the "Policy"). (Doc. #10-2). A state prisoner must first complete the process outlined in the Policy – including pursuing a grievance through "all three steps of the grievance process" – before he can file a lawsuit challenging the alleged unlawful conduct. (*Id.* at ¶ B). The Policy provides that if a prisoner cannot resolve his dispute with the staff member involved, he has five business days to file a Step I grievance. (*Id.* at ¶¶ P, V). If the prisoner is dissatisfied with the Step I response, he may submit a grievance appeal. (*Id.* at ¶ BB). To file a Step II grievance, the prisoner must request an appeal form from the Step I Grievance Coordinator, and then send the completed appeal form to the Step II Grievance Coordinator designated for the field or office being grieved either within ten business days after receipt of the Step I response or, if no timely response is received, within ten business days of the date the response was due. (*Id.*). If the grievant is dissatisfied with, or does not receive, a Step II response, he has ten business days within which to file a final appeal at Step III. (*Id.* at ¶ FF). Again, an inmate may only pursue a claim in court if he has complied with his obligations at each of these three steps. (*Id.* at ¶ B).

The Defendants argue that Graham did not properly exhaust his claims against them. They argue that Graham's claims against Chicowski, Willer, and Bowerman did not get past Step

7

I, and his claims against Trouten did not get past Step II.  (Doc. #10 at 14).  More specifically, they argue that Graham's claims against Chicowski, Willer, and Bowerman should be dismissed because Graham never properly filed grievances against them and "has not produced any of these allegedly returned grievances."  (*Id.* at 13).  As to Trouten, they argue that Graham's claims against him should be dismissed because Graham's Step II grievance against him was untimely.  (*Id.*).  The Court will address each of these arguments in turn.

### a.  Graham's Claims against Chicowski and Willer

Graham alleged in his complaint that he filed separate grievances against both Chicowski and Willer.  Although their summary judgment argument is not entirely clear, Chicowski and Willer seem to be arguing either that Graham never filed these grievances at all ("has not produced any of these allegedly returned grievances."), or, if he did, failed to properly exhaust them through the three-step process.  (*Id.* at 13-14).  Either way, their arguments lack merit.

First, Graham attached to his response brief copies of the Step I grievances he claims he filed against Chicowski and Willer.  (Doc. #15 at 36, 38).  Chicowski and Willer did not file a reply brief or otherwise challenge the authenticity of these documents.  Thus, to the extent their summary judgment motion is premised on an assertion that Graham did not file Step I grievances against them, their motion should be denied.

Second, to the extent Chicowksi and Willer argue that Graham failed to properly exhaust grievances against them through the three-step process, their motion should also be denied.  The United States Supreme Court has recently reiterated that the PLRA's exhaustion requirement hinges on the *availability* of administrative remedies:  an inmate "must exhaust available remedies, but need not exhaust unavailable ones."  *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016).  The *Ross* Court identified "three kinds of circumstances in which an administrative remedy,

although officially on the books, is not capable of use to obtain relief": (1) where an administrative procedure "operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1859-60.

Courts have recognized that in circumstances similar to those present here, "although completing Step III [of the grievance process] is a sufficient condition, it is not always a necessary one." *Palmer v. Flore*, 3 F. Supp. 3d 632, 637 (E.D. Mich. 2014); *see also Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (establishing that the Sixth Circuit requires an inmate to make affirmative efforts to comply with the administrative procedures and analyzes whether those efforts to exhaust were sufficient under the circumstances). In *Palmer*, the inmate plaintiff filed a Step I grievance, received no timely response, and "made efforts" to obtain the Step II grievance appeal form. In dismissing the defendants' affirmative defense of failure to exhaust administrative remedies, the court found that the plaintiff's efforts "were sufficient to comply with the PLRA." *Id.* Similarly, in *Young v. Jackson*, No. 12-CV-12751, 2013 WL 8178397, at *8-9 (E.D. Mich. Nov. 13, 2013), the plaintiff did not dispute that he failed to file a Step II grievance, but argued that the prison failed to follow its own policy by not giving him a grievance appeal form when he requested one. In rejecting the defendants' failure to exhaust argument, the court specifically found that the defendants "have a duty to follow MDOC policy and provide prisoners with Grievance Appeal forms when so requested" and that the plaintiff's "numerous requests made in an effort to obtain the appropriate form in this matter show that he was attempting to comply with MDOC policy where the prison was not." *Id.* at *9.

9

With respect to Chicowski's and Willer's exhaustion argument, Graham has shown his case to be analogous to *Palmer* and *Young*.  Graham presented unrebutted evidence which, at a minimum, raises a question of fact as to whether the grievance process was "available" to him with respect to his grievances against Chicowski and Willer.  Graham submitted copies of grievance forms with respect to Chicowski and Willer, and he provided other evidence which tends to bolster the documents' authenticity.  For instance, he provided letters he sent to Trouten on October 20 and November 6, 2014 asking for a response to these Step I grievances, or in the alternative, a Step II grievance form for both grievances.  (Doc. #15 at 12 (Graham Aff. at ¶ 54), 49-50).  The letters indicate that on October 17, 2014, Graham had his father call Trouten to follow up on this matter.[5]  (Doc. #15 at 49-50; Graham Aff. at ¶¶ 53, 59-60).  Affidavits by Graham and his father assert that this call was made and that Trouten never returned it.  (Graham Aff. at ¶ 60; Doc. #15 at 58 (Cecil Graham Aff. at ¶¶ 9-10)).  Graham also provided a copy of a November 17, 2014 letter that he avers he sent to Shavers – apparently Graham's second letter to him – informing him that his grievances against Chicowski and Willer had not been assigned a grievance identifier number.  (Doc. #15 at 53; Graham Aff. at ¶ 68).  Graham avers that he never received a response from Shavers, and the Defendants have not suggested otherwise.  (Graham Aff. at ¶ 71).  Finally, Graham provided evidence that he and his sister, Michelle McKelvie, reached out to Grievance Section Manager Richard Russell to follow up on these grievances.  (Graham Aff. at ¶¶ 87-92; Doc. #15 at 65 (McKelvie Aff. at ¶¶ 1-4)).  Graham avers that he wrote to Russell and that McKelvie called him on two separate occasions.  (Graham Aff. at ¶¶ 87-92).  Russell allegedly never called her back.  (McKelvie Aff. at ¶¶ 2, 4).

---

[5] Graham avers that Trouten was the only person from whom he could obtain either a Step I response or a Step II grievance form.  (Graham Aff. at ¶¶ 55, 83).  Indeed, the Policy provides that "[t]o file a Step II grievance, the grievant must request a Prisoner/Parolee Grievance Appeal (CSJ-247B) from the Step I Grievance Coordinator."  (Doc. #10-2 at ¶ BB).

Graham argues that these documents show that he made an affirmative effort to exhaust his available administrative remedies with respect to his grievances against Chicowski and Willer.  (Doc. #15 at 23).  They do not argue to the contrary, and the Court agrees that Graham's evidence establishes at least a question of fact as to whether, with respect to Chicowski and Willer, the grievance process was actually "available" to Graham for purposes of the exhaustion analysis.  Accordingly, summary judgment should be denied as to Chicowski and Willer.

**b.  Graham's Claim against Bowerman**

Graham also alleged in his complaint that he filed a grievance against Bowerman. Despite significant factual differences between the grievance process with respect to Bowerman and the two grievances discussed above, Bowerman did little to present an individualized argument.  At any rate, Graham has raised a question of fact which precludes granting Bowerman's motion

First, Graham provides a copy of the September 26, 2014 Step I grievance he claims he filed against Bowerman.  (Doc. #15 at 40).  As a result, to the extent Bowerman's summary judgment motion rests on an assertion that Graham did not file a grievance against him, it should be denied.  Second, Graham has raised a question of fact as to whether the grievance process was made "available" to him in this instance.  Although not entirely clear, Bowerman seems to argue that, assuming Graham filed a grievance against him, Graham failed to "properly" exhaust it. Here, Bowerman appears to argue that Graham's grievance against him was properly rejected at Step I because, on the grievance form, Graham failed to write his name in the box labeled "Name."  (Docs. #10 at 7, 10-3 at 10).[6]  This argument lacks merit.

---

[6] Bowerman has made such a skeletal argument on this point that the Court could find it to be waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

While Graham concedes that he did not write his own name in the "Name" box on the top of the Step I grievance form, he did include his assigned prisoner number, institution, and "lock number" in the appropriate boxes, and he signed his name at the bottom of the grievance form. (Doc. #15 at 40). Yet, after more than a month elapsed, Trouten rejected the grievance without assigning it an identification number, without signing it, and without providing Graham any explanation for the rejection. (*Id.* at 26-28, 40).

In his response brief, Graham argued that the failure to at least assign the grievance an identification number, or explain why it was rejected was contrary to the MDOC policy regarding grievance administration. Bowerman did not respond to Graham's argument, which, at least on the present record, the Court finds to have merit. First, Graham clearly provided enough information on the grievance form to identify him as its author; he included his prisoner number, institution, "lock number," and signed his name. The responder (apparently Trouten) wrote "Graham" in bold on the grievance when returning it. (Doc. #15 at 26, 40). Second, Bowerman has failed to show that the grievance was improperly completed. Nowhere in the Policy does it provide that the grievant's name must be listed in a particular place on the grievance form to be proper.[7] Third, Bowerman has failed to show that the grievance was

---

waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal quotations omitted). He merely states, in his Statement of Facts, that "Trouten returned the grievance to Graham because he did not completely [sic] the grievance form properly." (Doc. #10 at 7). Although Bowerman references a related exhibit, nowhere in his brief does Bowerman actually explain why Graham's grievance was deemed "improper," or whether the law supports that position. In fact, in his brief's Argument section, Bowerman writes only: "Here, it is clear that Graham never properly filed any grievances against Chicowski, Willer, or Bowerman. Indeed, Graham has not produced any of these allegedly returned grievances." (Doc. #10 at 13).

[7] The Policy specifies that when completing a grievance form, the grievant should include the dates, times, and names of those involved in the issue being grieved. (Doc. #10-2 at ¶ R). But this refers to the details surrounding "the issue being grieved," not the grievant's identity, which

appropriately rejected.  The only record produced by Bowerman on this point (the contents of which are not mentioned in his motion) cites to an *alleged* provision of the relevant MDOC Policy Directive – "page 2 of 6 #5" – which conflicts with the version of the Policy Directive attached as Exhibit 2 to Bowerman's motion.  (*Cf.* Doc. #10-2 (stating that the Policy Directive provides that "the Grievance Coordinator shall determine if the grievance is appropriately completed [], if not, returns [sic] to the prisoner prior to assigning a grievance identifier.") with Doc. #10-2, ¶¶ W, X ("The Grievance Coordinator shall log and assign a unique identifying number to each Step I grievance received, including those which may be rejected . . . After receipt of the grievance, the Grievance Coordinator shall determine if the grievance should be rejected pursuant to this policy, and if so, sign and return the grievance to the grievant with an explanation as to why it was rejected.")).  Finally, the Policy provides that the "due date [for a response to a grievance] shall be within 15 days after receipt of the grievance unless an extension is granted pursuant to Paragraph S."  (Doc. #10-2 at ¶ X).  Graham alleges that the Step I grievance form was returned to him on October 23, 2014.  (Doc. #1 at ¶ 90).  The form does not indicate when it was received, and there is no evidence that an extension was granted, so it is hard to tell when a response to Graham was due.  (Doc. #15 at 40).

For the reasons stated above, Graham has raised a question of fact as to whether he failed to exhaust his "available" remedies with respect to his grievance against Bowerman.  Thus,

---

in this case, Trouten was able to determine based on the other "legible" information Graham provided.  (*Id.*; Doc. #15 at 40).  *Hall v. Warren*, No. 09-2400, 443 F. App'x 99, 105-06 (6th Cir. Oct. 18, 2011) (interpreting this provision of the MDOC Policy as requiring the grievant to name in the grievance all others, aside from the prisoner, who were involved in the issue being aggrieved); *Mattox v. Edelman*, 851 F.3d 583 (6th Cir. 2017), *reh'g denied* (April 6, 2017) ("We have explained that a prisoner ordinarily does not comply with [the Policy's ¶ R] – and therefore does not exhaust his administrative remedies under the PLRA – when he does not specify the names of each person from whom he seeks relief.") (citing *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324-25 (6th Cir. 2010)).  And, even if this provision applies to the grievant's identity, Graham technically complied with it because he wrote his name on the form when he signed it.

Bowerman's summary judgment motion should be denied.

    c. **Graham's Claim against Trouten**

The Defendants do not contest that Graham filed the Trouten Grievance, or that he pursued it through Step III. (Docs. #10 at 7; #10-3 at 3). Trouten argues, however, that Graham's Step II appeal was untimely, and that on account of its tardiness, the MDOC did not address the Trouten Grievance "on the merits through all stages of the grievance process." (Doc. #10 at 14). Accordingly, Trouten argues that Graham failed to properly exhaust the grievance.

Trouten asserts that Graham's Step I grievance was denied on October 31, 2014, and, without providing any proof or documentation, further asserts that the Step I response and Step II appeal form pertaining to this grievance "were sent to Graham thereafter." (*Id.* at 8). He asserts that the Step II appeal form stated that it needed to be submitted by November 18, 2014, yet Graham did not return it until December 10, 2014. (*Id.*) (citing Doc. #10-3 at 8). But also attached to the *Defendants' motion* is a November 19, 2014 letter from Graham to Trouten in which Graham made a "second request" for a Step II grievance form for the Trouten Grievance. (Doc. #10-3 at 12). Graham states that his first request for this form "was sent via U.S. Mail letter dated 11-6-14," which was before the Step II deadline. (*Id.*). Trouten does not address this evidence submitted by Graham, which raises a question of fact as to whether the grievance process was reasonably available to him with respect to the Trouten Grievance.

In addition to this November 19, 2014 letter, Graham provides other evidence that raises similar factual questions. Graham provides proof that he received a Step I grievance receipt (Doc. #15 at 47; Graham Aff. at ¶ 63) and that on November 6, 2014, he received a Step I response. (Graham Aff. at ¶ 64). The receipt indicates that Graham's response was due on November 19, 2014. (Doc. #15 at 47; Graham Aff. at ¶ 63). Graham asserts that he then made

multiple attempts to obtain a Step II grievance form:  (1) on November 6, 2014, he sent a letter to Trouten; (2) on November 13, 2014, Cecil Graham called Trouten, but Trouten did not answer or respond; (3) on November 17, 2014, he sent a letter to Shavers, which received no response; and (4) on November 19, 2014, he sent another letter to Trouten.  (Doc. #15 at 31, 50-51, 53; Graham Aff. at ¶¶ 65-68, 71; Cecil Graham Aff. at ¶¶ 11-12).   Graham supported these assertions with copies of the letters and sworn testimony.  (Doc. #15 at 50-51, 53; Graham Aff. at ¶¶ 65-68, 71; Cecil Graham Aff. at ¶¶ 11-12).   Graham also provides affidavits indicating that he and McKelvie called and wrote to Russell to follow up on the Trouten Grievance but received no response.  (Graham Aff. at ¶¶ 87-92; McKelvie Aff. at ¶¶ 1-2).  Trouten did not file a reply brief, and thus did not challenge the authenticity or significance of Graham's evidence.

Graham states in his complaint, response brief, and affidavit that he did not receive a Step II grievance form from Trouten until December 3, 2014 – almost one month after he received the Step I response, and approximately two weeks after his Step II response was due.  (Docs. #1 at ¶ 105; #15 at 31-32; Graham Aff. at ¶ 72).  The Step II grievance form indicates that Graham promptly filled it out two days later, on December 5, 2014, and that it was rejected as untimely on December 10, 2014.[8]  (Doc. #15 at 44).  Graham avers that he received a Step III response on October 20, 2015 – practically ten months later – and he provides a copy of the document as proof.  (Doc. #15 at 45; Graham Aff. at ¶ 82).

In sum, based on the foregoing unrefuted evidence, Graham has at least raised a question of fact as to whether he timely exhausted his "available" remedies with respect to the Trouten

---

[8] Graham also contests the Trouten Grievance being rejected as untimely because his transfer from RGC to SRF required him to communicate with Trouten by mail.  He argues that his circumstances fall under Paragraph G(4) of the Policy, which explicitly provides that a grievance "shall not be rejected if there is a valid reason for the delay [in filing it]; e.g., transfer."  (Docs. #15 at 31; #10-2 at ¶ G(4)).

Grievance. Accordingly, Trouten's motion for summary judgment should be denied. *See Palmer*, 3 F. Supp. 3d at 637; *Young*, 2013 WL 8178397, at *8-9.[9]

                    2.      *Graham's Motion for Partial Summary Judgment*

On December 28, 2016, Graham filed a Motion for Partial Summary Judgment on his First Amendment claim against the Defendants. (Doc. #18). "It is the Court's usual practice to defer any consideration of summary judgment motions until after the close of discovery, in order to ensure that its rulings are based on a complete record." *Jefferson Chevrolet Co. v. Enterprise Leasing Co.*, No 07-15491, 2008 WL 4104363, at *1 (E.D. Mich. Aug. 29, 2008) (denying the parties' summary judgment motions without prejudice because "[t]he Court [found] no basis to deviate from this usual practice"; since discovery was still ongoing, the parties' cross-motions "appear[ed] to rest upon significantly divergent views of the record," and "important avenues of discovery . . . had yet to be pursued"). Consistent with this practice, a defendant "is entitled to a reasonable opportunity for discovery before having to defend against a summary judgment motion." *Fits v. Snyder*, No. 12-13575, 2014 WL 1304634, at *2 (E.D. Mich. Mar. 31, 2014).

Here, discovery has not started. Assuming the Court's recommendation to deny the Defendants' motion for summary judgment based on exhaustion grounds is adopted, the case will move forward pursuant to a scheduling order that sets deadlines for the completion of discovery and the filing of dispositive motions. Accordingly, the Court should deny Graham's instant motion without prejudice to his right to refile it after discovery closes.

---

[9] Defendants assert that if the Court finds that there are questions of material fact as to the exhaustion issue, it "should order discovery limited to the issue of exhaustion only." (Doc. #10 at 15 n.1). Defendants do not support this assertion with any citations or analysis, and in light of their complete failure to challenge (or even address) Graham's evidence, it would be inefficient to limit discovery as proposed by Defendants. However, because Defendants are entitled to pursue discovery with respect to Graham's evidence related to the exhaustion issue, their summary judgment motion should be denied without prejudice.

## III.     CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment (**Doc. #10**) and Graham's Motion for Partial Summary Judgment (**Doc. #18**) be **DENIED WITHOUT PREJUDICE**.

Dated: April 18, 2017                                   s/David R. Grand
Ann Arbor, Michigan                                   DAVID R. GRAND
                                                                      United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 18, 2017.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager