UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TORRANCE GRAHAM,

                Plaintiff,          Civil Action No. 16-12258
                                                Honorable Linda V. Parker
v.                                        Magistrate Judge David R. Grand

HEATHER CHICOWSKI, WILLER,[1]
BOWERMAN, and MICHAEL TROUTEN,

                Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [43]

Before the Court is a motion for summary judgment filed on January 26, 2018, by Defendants Heather Chicowski, Tyler Willer, Paul Bowerman, and Michael Trouten (collectively "Defendants"), who are all Michigan Department of Corrections ("MDOC") employees. (Doc. #43). *Pro se* Plaintiff Torrance Graham ("Graham"), an incarcerated person, filed a response to this motion on March 6, 2018. (Doc. #45). No reply was filed. An Order of Reference was entered on September 12, 2016, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b). (Doc. #11). Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody. *See* E.D. Mich. L.R. 7.1(f). Here, the Court finds that the facts and legal issues are adequately presented in the briefs, and it declines to order a hearing at this time.

## I. RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **(Doc. #43)** be **GRANTED**.

---

[1] The docket incorrectly lists this Defendant as "Miller."

**II. REPORT**

    **A. Background**

Graham is a State of Michigan prisoner who is currently confined at the Chippewa Correctional Facility in Kincheloe, Michigan. He brought this civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of his First and Fourteenth Amendment rights. (Doc. #1). At the time of the events at issue, Graham was housed at the Duane Waters Health Center ("DLW") in Jackson, Michigan, and the Saginaw Correctional Facility ("SRF") in Freeland, Michigan. (*Id.* at ¶ 3). The MDOC's website explains that DLW is located on the premises of the Charles Egeler Reception and Guidance Center.[2] According to Graham, all of the named defendants were employed at DLW. (*Id.* at ¶¶ 4-7).

Graham alleges that on September 7, 2014, he was transferred from a hospital in Lansing, Michigan, to DLW for intravenous antibiotic treatment. (*Id.* at ¶ 10). He alleges that while receiving his treatment on September 23, 2014, he informed the nurse his IV site was sore and it appeared to have a skin burn. (*Id.* at ¶ 11). He also advised that the IV bag was different from the one he had been administered earlier that day.[3] (*Id*. at ¶¶ 13, 15). He recalls that they also discussed the IV extension. (*Id.* at ¶¶ 18-19). Graham recounts this being a pleasant exchange, yet he alleges that before the nurse left the room, Defendant Nurse Supervisor Chicowski "came into the room in an aggressive manner and accused [him] of being argumentative with nursing staff [about an IV extension]." (*Id.* at ¶¶ 20, 25). Graham alleges that Chicowski instructed the

---

[2] Michigan Department of Corrections Charles Egeler Reception & Guidance Center, http://www.michigan.gov/corrections/0,4551,7-119-68854_1381_1385-5338--,00.html.

[3] Graham alleges that the treatment was different in terms of the number of IV bags used and the "start date" and "stop date" on the bag. (Doc. #1 at ¶¶ 13, 15). He recalled that his previous treatment had been administered via two bags, with a September 19, 2014 "start date" and a September 25, 2014 "stop date." (*Id.*). In contrast, his later treatment was contained in one bag that had a September 11, 2014 "start date" and a September 15, 2014 "stop date." (*Id.* at ¶ 12).

2

nurse to "put down he refused his meds" if he continued to ask questions.  (*Id.* at ¶¶ 21, 27, 29). She allegedly also told the nurse not to put any more extensions on his IV if his questioning did not stop.  (*Id.* at ¶ 27).  Before Chicowski left the room, Graham told her that he would be filing a grievance against her as DLW's Prisoner/Patient Bill of Rights gives him the right to ask questions.  (*Id.* at ¶¶ 22, 28, 31 36).

Graham alleges that shortly thereafter, Defendant Correctional Officer Willer also accused him of being argumentative.  (*Id.* at ¶ 37).  Willer allegedly told him to be quiet and not ask questions because "prisoners don't have any rights," so "they are to do as they are told."  (*Id.* at ¶¶ 35, 37-38, 45).  Graham alleges that Willer then said he was going to put him on "red card status."  (*Id.* at ¶ 41).  Graham alleges that he asked to speak to a supervisor but that Willer refused this request.  (*Id.* at ¶¶ 42-47).

Graham alleges that an unknown officer woke up him and his cellmate, Cliff Disney ("Disney"), the next morning at 2:30 a.m.  (*Id.* at ¶ 52).  Disney was moved to a different location (*id.* at ¶ 59), and the unknown officer informed Graham that Defendant Sergeant Bowerman had instructed him to place Graham on "red card/toplock status" "for telling Chicowski that he was writing a grievance and threatening behavior."  (*Id.* at ¶¶ 54-56).  Graham explains that toplock "is a sanction for a misconduct" but asserts he never received a misconduct related to this incident.[4]  (*Id.* at ¶¶ 60-62, 66, 72).  Nor did he receive a hearing before these

---

[4] Michigan Department of Corrections, Correctional Facilities Administration, *Family Information Packet* at 8, available at
http://www.michigan.gov/documents/corrections/Family_Information_Packet_3
2017_597501_7.pdf:

> A prisoner on toplock shall not leave his/her cell, room, or bunk area for any reason without specific authorization from the appropriate staff person.  The prisoner may be deprived of use of his/her television, radio, tape player, and portable media player while on toplock as provided in the

sanctions were imposed. (*Id.* at ¶ 124).  On September 26, 2014, Graham was transferred to SRF. (*Id.* at ¶ 82).

On June 17, 2016, Graham filed a complaint in this Court alleging violations of his First and Fourteenth Amendment rights.  (Doc. #1).  His First Amendment claim alleges unlawful retaliation.  (Doc. #1 at 14-15).  His Fourteenth Amendment claim alleges a violation of his right to due process.  (*Id.* at 3).  On January 26, 2018, Defendants filed a motion for summary judgment as to both claims, while also asserting a right to qualified immunity.  (Doc. #43).  Graham filed a response which the Court received on March 6, 2018.  (Doc. #45).

### B. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

---

> facility operating procedure.  Prisoners shall be released from toplock for regular showers, visits, medical care (including individual and group therapy), school, and law library.  The Warden or designee may authorize prisoners on toplock to go to the dining room, work assignments, and/or other specified activities, including group religious services; prisoners not released from toplock for store and Securepak orders shall have store and SecurePak orders delivered to them.  Prisoners on toplock shall have a minimum of one hour per day of out-of-cell activity, which may include all out-of-cell activities described above.

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

**C. Analysis**

Defendants argue that summary judgment in their favor is warranted in three respects: (1) Graham's First Amendment retaliation claim fails because he cannot meet the required elements of such a claim; (2) Graham's Fourteenth Amendment due process claim fails because he does not allege a violation of a constitutionally-protected liberty interest, meaning he is not entitled to any subsequent due process protection; and (3) Defendants are entitled to qualified immunity because they did not violate any of Graham's clearly-established constitutional rights. (Doc. #43). These arguments are addressed below.

   1. *First Amendment Retaliation Claim*

Defendants assert in their motion for summary judgment that Graham is unable to establish any of the three elements which are required to state a viable First Amendment retaliation claim. (*Id.* at 2-6). They contend Graham cannot show that: 1) he was engaged in

protected activity; 2) an adverse action was taken against him; or 3) a causal nexus exists between the first and second elements. (*Id.*). Defendants conclude that because Graham cannot make the required showing, his "personal belief that [he] is a victim of retaliation is insufficient to raise a meritorious retaliation claim." (*Id.* at 3).

A prima facie case of First Amendment retaliation requires three elements: 1) the plaintiff participated in constitutionally-protected activity; 2) the defendant took an adverse action against the plaintiff "likely to chill a person of ordinary firmness" from engaging in the protected conduct; and 3) there is a causal connection between elements one and two – that is, "the adverse action was motivated at least in part by the plaintiff's protected conduct." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (*citing Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). "This formulation describes retaliation claims in general, but it will yield variations in different contexts." *Id.* Put differently, the analytical approach in these cases is "intensely context-driven," and while the elements remain constant between cases, "the underlying concepts that they signify will vary with the setting." *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010). Thus, whether a statement is "protected" or an official's responsive action is "adverse" frequently turns on the particular facts of a case, such as whether the case is being brought by a prisoner. *Id.* (citing *Thaddeus-X*, 175 F.3d at 397); *see also Hudson v. Palmer,* 468 U.S. 517, 523 (1984) (holding that prisoners "retain those First Amendment rights of speech 'not inconsistent' with their status as . . . prisoners or with the legitimate penological objectives of the corrections system" (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974))); *Thaddeus-X*, 175 F.3d at 395 ("[I]t is generally much harder for a prisoner to show that his conduct is protected because prison regulations are allowed

to infringe on prisoners' rights as long as they are rationally related to a legitimate penological concern.") citing *Turner v. Safley*, 482 U.S. 78 (1987).

As mentioned above, Defendants argue that Graham cannot prove any of the elements of this claim. (Doc. #43 at 3). The Court need only address the second element – whether an adverse action was ever taken against him likely to chill a person of ordinary firmness from engaging in the protected conduct in question.[5]

Defendants argue that "no adverse action exists because there is no nexus between [Graham's] loss of privileges sanction . . . and the incident he described in his complaint." (*Id.* at 11-12). They contend that the only sanction Graham ever received was a loss of privileges for three days. (*Id.*). They further claim Graham was never placed on toplock status, and that the loss of privileges sanction was due to a separate event having nothing to do with the alleged incident at the hospital.[6] (Doc. #43 at 11). Graham, on the other hand, claims an adverse action was taken against him when he was placed on toplock status without notice or a hearing, supposedly in retaliation for his behavior at the hospital. (Doc. #45 at 7-8). He also avers that to accept Defendants' argument "would be like accepting evidence from a poisonous tree." (*Id.* at

---

[5] The Court need not discuss the first and third elements of Graham's First Amendment retaliation claim because the Court finds that Graham cannot establish that an adverse action was taken against him, which alone entitles Defendants to summary judgment on this claim. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir. 2005).

[6] Defendants state that on September 19, 2014, Graham "was issued a Class II misconduct for disobeying a direct order," as a result of apparently pushing another inmate. (Doc. #43 at 11). They assert that a hearing took place to determine what discipline would result from this pushing incident, and after being found guilty, Graham was sanctioned merely with a loss of privileges. (*Id.*). Indeed, in their motion for summary judgment, they aver "[Graham] was never placed on toplock status." (*Id.*). The record of the disciplinary hearing related to this pushing incident shows the box next to the toplock sanction was not checked, but that a three-day loss of privileges sanction was assigned and set to begin on September 28, 2014 and end on October 1, 2014. (Doc. #43-3 at 2). Nevertheless, despite the Defendants' averment to the contrary, medical records indicate that Graham was on toplock status from September 24-25, 2014. (Doc. #45 at 76, 80).

7

7). While Defendants' argument conflates the "adverse action" and "causal connection" elements of a First Amendment retaliation claim, the Court finds that Graham cannot demonstrate an "adverse action" was taken against him with respect to what he claims was his protected speech.

An action is "adverse" only if it would "chill or silence a person of ordinary firmness" from exercising the right at stake. *Ctr. For Bio-Ethical Reform, Inc. v. City of Springsboro*, 477 F.3d 807, 822 (6th Cir. 2007) (citing *Thaddeus-X*, 175 F.3d at 397). While the level of harassment needed to satisfy this standard is by no means stringent, *Holzemer*, 621 F.3d at 524, the plaintiff must prove more than a mere *de minimis* effect on protected activity to raise a cognizable constitutional claim. *Thaddeus-X*, 175 F.3d at 396.

"The Sixth Circuit has held that 14 days' loss of privileges, a short period in toplock, and extra duty are *de minimis* sanctions that would not deter a person of ordinary firmness from pursuing a grievance or other First Amendment Protected Activity." *Jennings v. Bennett*, No. 1:17-cv-555, 2017 WL 3712176, at *11 (W.D. Mich. 2004) (citing *Ingram v. Jewell*, 94 F. App'x. 271, 273 (6th Cir. 2004)); *Gordon v. Benson*, No. 1:12-CV-295, 2012 WL 2522290, at *13 (W.D. Mich. June 28, 2012) (stating that seven days loss of privileges is not adverse action). Accordingly, the parties' disagreement over the sanction brought against Graham (*i.e.*, whether he was subject to a loss of privileges or placed on toplock status) is of no consequence. Neither of these sanctions would impose anything more than a *de minimis* effect on protected activity, meaning they do not constitute an adverse action for purposes of bringing a First Amendment retaliation claim.

The only other allegedly adverse action Graham raises is the removal of his former cellmate, Disney, from their shared room. (Doc. #45 at 11). Graham merely states, without

providing any evidence or authority other than Disney's own affidavit, that this constituted an adverse action because "[i]t is a well[-]known fact amongst the medical community that people heal faster when they share a room." (*Id.* at 8). There is no indication that Disney is a medical professional, and regardless, "[c]ell assignments are a normal part of prison life, and thus typically do not amount to an adverse action." *LaFountain v. Harry*, 716 F.3d 944, 949 (6th Cir. 2013) (holding cell assignments only constitute an adverse action in "extraordinary circumstances," and finding this exception met when prison officials placed a prisoner (LaFountain) with a mentally ill inmate who expressly and repeatedly threatened to stab LaFountain with a knife hidden in the prison yard). Thus, while Disney's re-assignment may have been disappointing or upsetting to Graham, Graham has not raised a material question of fact that such a common aspect of prison life would deter a person of ordinary firmness from pursuing a grievance or engaging in other protected activity. As a result, Disney's re-assignment does not rise to the level of an adverse action.

For the foregoing reasons, Defendants' motion for summary judgment should be granted as to Graham's First Amendment claim.

### 2. *Fourteenth Amendment Due Process Claim*

Defendants argue that they are entitled to summary judgment on Graham's claim that his placement on toplock status or being subject to a temporary loss of privileges violated his rights under the Due Process clause. More specifically, they argue that Graham fails to identify an interest protected by the Due Process Clause here because prisoners have no constitutionally-protected liberty interest in avoiding placement on toplock status or being subject to a temporary loss of privileges. (Doc. #43 at 15). Graham disagrees and contends that Defendants violated his right to procedural due process because he "has a right to receive written [notice of charges],

9

to be provided a hearing and to present a defense to any disciplinary charges before being placed on sanction." (Doc. #45 at 3). Put simply, Graham asserts that he was deprived of his right to avoid placement on toplock status without adequate notice and proceedings.[7]

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "In order to establish a procedural Due Process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the State did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). In this case, Graham specifies that he is alleging a violation of a liberty interest. (Doc. #45 at 3).

Under the Due Process Clause, prisoners retain a constitutionally-protected liberty interest with respect to state-imposed prison discipline in only two scenarios. The first, one not implicated here, is when a sanction "will inevitably affect the duration of [an inmate's] sentence," such as the revocation of good-time credits. *Sandin v. Conner*, 515 U.S. 472, 486-87 (1995); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974). The second, which is relevant here, implicates due process protection when a disciplinary sanction "imposes [an] atypical and

---

[7] Graham also argues that he that he "has a liberty interest in deciding whether to refuse [h]ealth[c]are or continue with treatment." (Doc. #45 at 3). However, Graham's argument about a "right to treatment" is misguided, as he never suggests that he was deprived of – or precluded from receiving – any treatment. (*See* Docs. #1, #45); *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (finding that when it comes to a due process claim, "what is unconstitutional is the *deprivation* of such an interest without due process of law") (emphasis added). Graham only alleges that he received a negatively-toned response after questioning certain aspects of his medical treatment and that he was retaliated against for doing so. *See supra* at 2-3. Because he makes no showing that any deprivation of treatment occurred – and because he is merely re-asserting his retaliation claim which has already been found to be without merit (*see supra* at 5-9) – this "right to treatment" argument does not sound in a due process violation. Accordingly, the Court will not address this "right to treatment" argument further.

10

significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin* 515 U.S. at 484 (holding that the prisoner was incorrect in asserting "that any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause . . . "). Thus, a liberty interest must first be confirmed before addressing whether due process protections are available to prisoners. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (holding the court "need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest").

"[A] liberty interest arises from two distinct sources – from the implicit guarantees of the Due Process Clause itself, or as a result of state action." *Bazzetta v. McGinnis*, 430 F.3d 795, 798 (6th Cir. 2001). Arguing under the latter, Graham cites prison regulations which he believes establish his liberty interest in avoiding a toplock sanction without notice, a hearing, and an opportunity to present evidence. (Doc. #45 at 9-10). He claims that given the language of the MDOC policy directives, any failure to follow them necessarily establishes a violation of his due process rights. (*Id.* at 13-14). However, this argument that a constitutionally-protected liberty interest can emanate from the language of prison regulations themselves has been rejected by the Sixth Circuit:

> [The Supreme Court] had previously employed a methodology for identifying state-created liberty interests that emphasized the language of a particular [prison] regulation instead of the nature of the deprivation. The Court abandoned this methodology, significantly limiting the authority of courts to find liberty interests stemming from positive state law in the prison context. Instead, it stated that the relevant inquiry must focus on the nature of the deprivation imposed on a prisoner, holding that if the nature of the deprivation does not impose an atypical and significant hardship . . . in relation to the ordinary incidents of prison life, prisoners will not have a liberty interest in avoiding the deprivation. Applying this refined inquiry, [the Supreme Court] found no liberty interest protecting against a 30-day assignment to segregated confinement because it did not present a dramatic departure from the basic contours of the conditions of the inmate's sentence.

*Bazzetta*, 430 F.3d at 802 (internal citations omitted).  Accordingly, this Court's inquiry focuses on the nature of the alleged deprivation; specifically, whether it imposed an atypical and significant hardship relative to the ordinary incidents of prison life.  *Id.* at 802; *see supra* at 11.

Under this analysis, a liberty interest – and any subsequent due process protection – will only be found if Graham was subjected to a hardship that contravenes the expectations of prison life, because "to hold [otherwise], . . . that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts."  *Meachum v. Fano*, 427 U.S. 215, 225 (1976).  "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply."  *Wolff*, 418 U.S. at 539.

In determining whether due process is owed in the first place – and if so, the degree of protection that should be afforded – the extent of the hardship in question must be weighed in light of the nature of the sanction imposed and its duration.  *Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th Cir. 2008).  As such, not every punishment levied against a prisoner entails a liberty interest entitling him to due process protection.  *Jones*, 433 U.S., at 125 ("[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."); *Sandin*, 515 U.S. at 485-87 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law . . . . [The] Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner."); *Wolff*, 418 U.S. at 539 ("[T]here must be mutual accommodation between institutional needs . . . and the provisions of the Constitution.").

Here, Graham does not have a constitutionally-protected liberty interest at stake because even the most restrictive alleged hardship imposed on him – placement on toplock status, *see supra* at 3-4 n. 4, – is not an atypical and significant hardship relative to the ordinary incidents of prison life. Indeed, "administrative segregations have repeatedly been held not to involve an 'atypical and significant' hardship implicating a protected liberty interest without regard to duration." *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998) (citing *Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir. 1995)); *Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997). Instead, "[p]lacement in segregation imposes atypical and significant hardship only in 'extreme circumstances.'" *Hollins v. Curtin*, No. 1:13-CV-008, 2015 WL 1458944, at *12 (W.D. Mich. Mar. 30, 2015), *aff'd* (Feb. 3, 2016) (quoting *Joseph v. Curtin*, 410 F. App'x. 865, 868 (6th Cir. 2010)). *See also Sandin*, 515 U.S. at 485-86 (holding that 30 days of disciplinary segregation did not give rise to a protected liberty interest); *Morefield v. Smith*, 404 F. App'x. 443, 446 (11th Cir. 2010) (holding a four-year confinement in administrative segregation did not establish a liberty interest); *Williams v. Lindamood*, 526 F. App'x 559, 563 (6th Cir. 2013) (finding that temporary confinement to administrative segregation, including confinement to cell for 23 hours per day, was not an atypical or significant hardship); *Bradley v. Evans,* 229 F.3d 1150, at *8 (6th Cir. 2000) (determining that temporary confinement to maximum security punitive segregation did not violate a prisoner's procedural due process rights).

Other forms of sanction in the prison context, such as the temporary loss of privileges, similarly do not pose an atypical and significant hardship relative to the ordinary incidents of prison life. *Overton v. Bazzetta*, 539 U.S. 126, 136-37 (2003) (providing that temporary withdrawal of visitation privileges for disciplinary purposes was "not a dramatic departure from accepted standards for conditions of confinement"); *Meachum*, 427 U.S. at 224-25 (1976)

13

(holding that no liberty interest is implicated when a prisoner is transferred to an institution with more severe rules).[8] These cases make clear that Graham did not possess a constitutionally-protected liberty interest implicating due process protection.

Ultimately, Graham's placement on toplock status and temporary loss of privileges "did not present the type of atypical, significant deprivation . . . creat[ing] a liberty interest." *Sandin*, 515 U.S. at 486. Accordingly, Defendants' motion for summary judgment as to Graham's Fourteenth Amendment due process claim should be granted.

### 3. Qualified Immunity

Given the Court's earlier finding that summary judgment should be granted as to Graham's First and Fourteenth Amendment claims, the Court need not address the application of qualified immunity. Nonetheless, the Court notes that qualified immunity would also serve to protect Defendants from suit.

Defendants argue in their motion for summary judgment that they are entitled to qualified immunity because Graham "has not demonstrated that [they] violated any of his clearly-established constitutional or statutory rights." (Doc. #43 at 18). In his response, Graham states that Defendants are not entitled to qualified immunity because their arguments related to the "non-applicable class-II misconduct" (*see supra* note 5), shows "the Defendants are attempting to cover[] up their deficiencies by presenting false evidence," and that the litigation which has ensued evinces their "attempt to . . . use mud to make apple juice." (Doc. #45 at 17). Without addressing how the qualified immunity doctrine applies to his particular case, he concludes that

---

[8] In his response, Graham relies on *Harris v. Caruso*, 465 F. App'x 481 (6th Cir. 2012) for the supposed rule that he is entitled to due process protection – namely notice, a hearing, and chance to present evidence on his behalf – before being placed on toplock status. (Doc. #45 at 11). However, in that case, a prisoner's administrative segregation lasted eight years, and only that very "*atypical duration* created a liberty interest." *Harris*, 465 F. App'x at 484 (emphasis added). Accordingly, this case is of no avail to his argument.

14

because Defendants violated his First and Fourteenth Amendment rights, they are barred from asserting qualified immunity. (*Id.* at 18).

To determine whether a defendant is entitled to qualified immunity, a court must perform a two-part inquiry which may be conducted in any order. *Pearson v. Callahan*, 555 U.S. 223, 232-36 (2009). The court is required to ask whether the facts alleged or shown "make out a violation of a constitutional right" and "whether the right at issue was 'clearly established'" at the time of the incident. *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A plaintiff must satisfy both inquiries in order to defeat the assertion of qualified immunity. *Wesley v. Campbell*, 779 F.3d 421, 428-29 (6th Cir. 2015). As to the second, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." *Saucier*, 533 U.S. at 201. The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*

Here, the Court's determination that Defendants' conduct did not violate Graham's First or Fourteenth Amendment rights informs it that Defendants are entitled to qualified immunity. No right was clearly established because even if Graham's allegations are taken as true, it would not be clear to a reasonable officer that engaging in the same conduct would be unlawful. Accordingly, the Court finds that Defendants are entitled to qualified immunity.[9]

---

[9] To the extent Graham purports to state a claim related to the handling of his grievances or the Defendants' alleged failure to follow MDOC policies, any such claim fails, and Defendants would be entitled to qualified immunity. First, for the reasons stated above, the Court is able to resolve Graham's claims on the merits, without regard to the issue of exhaustion. Thus, nothing that occurred with respect to the grievance process affected Graham's access to the courts or his other substantive rights. Second, the law is clear that "there is no inherent constitutional right to an effective prison grievance procedure." *See Argue v. Hofmeyer*, 80 Fed. Appx. 427, 430 (6th Cir. 2003). *See also McGee v. Grant*, 863 F.2d 883, 1988 WL 131414, *1 (6th Cir. 1988) ("[I]nmate grievance procedures are not constitutionally required in state prison systems,

## III. CONCLUSION

For the reasons stated above, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **(Doc. #43)** be **GRANTED**.

Dated: April 5, 2018  s/ David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
 United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(a) and (b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Order and Report and Recommendation. *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir.

---

therefore, any failure on the part of defendants to follow grievance procedures does not give rise to a § 1983 claim."); *Walker v. Mich. Dep't of Corr.*, 128. F. App'x 441, 445 (6th Cir. 2005). And, the "mere denial of a prisoner's grievance states no claim of constitutional dimension." *Alder v. Corr. Med. Servs.*, 73 F. App'x 839, 841 (6th Cir. 2003). *See also*, *Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008) (the "'denial of administrative grievances or the failure to act by prison officials does not subject supervisors to liability under § 1983.'"); *Simpson v. Overton*, 79 F. App'x 117, 120 (6th Cir. 2003) ("[T]he denial of an appeal cannot in itself constitute sufficient personal involvement to state a claim for a constitutional violation."). Finally, prison officials are not required to follow their own procedural statutes and rules as a matter of federal due process. *Sweeton v. Brown*, 27 F.3d 1162, 1164 (6th Cir.1994) (prison regulations "do not create an independent federal due process liberty interest or right in the prisoner."); *see also Coleman v. Martin*, 363 F. Supp. 2d 894, 903 (E.D. Mich. 2005) ("the failure of a prison, or the state, to follow its own policies and procedures does not amount to a constitutional violation."). Thus, Graham's assertion that the MDOC policies granted him certain "Constitutional Rights," (Doc. #45 at 3, 18), is clearly incorrect. Accordingly, any claim based on Defendants' alleged failure to follow MDOC policies should be dismissed.

1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 5, 2018.

/s/ Eddrey O. Butts
EDDREY O. BUTTS
Case Manager